# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| SURENDRA RAMJIT, | : | Case No. 1:02cv1235 |
|  | : |  |
| Petitioner, | : | JUDGE KATHLEEN O'MALLEY |
|  | : |  |
| v. | : |  |
|  | : |  |
| WARDEN, LEBANON CORRECTIONAL | : | MEMORANDUM AND OPINION |
| INSTITUTION | : |  |
|  | : |  |
| Respondent. | : |  |

Before the Court is Surendra Ramjit's ("Ramjit") petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 on June 27, 2002 (Doc. #1).  Ramjit challenges the constitutional sufficiency of his jury conviction for aggravated murder, with a firearm specification, in the case of *State of Ohio v. Ramjit*, Case No. CR-371189 (Cuyahoga County 1999).  This matter was referred to Magistrate Judge Patricia A. Hemann pursuant to Local Rule 72.2(b)(2).  After Respondent filed a *Return of Writ* (Doc. #29) and Ramjit filed his *Traverse to Return of Writ* (Doc. #39), Magistrate Judge Hemann issued a *Report and Recommendation* ("R&R") (Doc. #40).

The R&R recommends granting the petition on the grounds that Ramjit's Sixth Amendment rights to confront witnesses against him and to the effective assistance of counsel were violated

during his trial in state court.[1]  Specifically, the Magistrate Judge found that: (1) the introduction of an accomplice's statements, when the accomplice himself refused to testify, violated Ramjit's Sixth Amendment right of confrontation; (2) even if, *arguendo*, the Confrontation Clause had not been violated, Ramjit was denied his Sixth Amendment right to effective assistance of counsel when Ramjit's trial counsel "opened the door" to the admission of the accomplice's statements; and (3) Ramjit's Sixth Amendment right to effective assistance of counsel was also violated when his trial counsel failed to object to the substitution of a dismissed alternate juror for a regular juror after deliberations had begun.  Because the Magistrate Judge recommended granting Ramjit's petition on two separate grounds (confrontation clause and ineffective assistance), she did not examine the other grounds for relief argued by Ramjit, which are Ramjit's additional claims that he was denied the effective assistance of trial counsel in violation of the Sixth Amendment, Ramjit's claim that he was denied the effective assistance of *appellate* counsel in violation of the Sixth Amendment, and his contention that he is actually innocent of the crime of which he was convicted.

Respondent and Ramjit both filed objections to the R&R (Doc. #43 and Doc. #48, respectively) as well as responses to each other's objections (Doc. # 56 and Doc. #53, respectively).  After reviewing the R&R and the filings of the parties, the Court hereby **ADOPTS in part** the R&R; specifically, the Court adopts the Magistrate Judge's conclusion that Ramjit's Sixth Amendment right of confrontation was violated when an accomplice's out-of-court statements were introduced

---

[1]  The Magistrate Judge found that the Confrontation Clause violation also implicated Ramjit's due process right to fundamental fairness.  That finding, however, was made in response to an alternative argument put forward by Respondent, and did not constitute the core basis of the Magistrate Judge's analysis.  Because the Court finds that the Confrontation Clause violation provides solid ground for granting habeas relief, the Court does not address the Magistrate Judge's alternative finding.

2

at trial without Ramjit having the opportunity to cross-examine the accomplice about those statements.  Unlike the Magistrate Judge, however, the Court concludes that this Confrontation Clause violation was exacerbated by the prosecutor's examination of the accomplice, who repeatedly asserted his Fifth Amendment right not to testify in Ramjit's trial, regarding the accomplice's out-of-court confession.  The Court, therefore, concludes that Ramjit is entitled to habeas relief and **GRANTS** Ramjit's petition for a writ of habeas corpus.

Because the Court adopts the portion of the R&R finding a violation of the Confrontation Clause and agrees with the Magistrate Judge that a writ of habeas corpus should issue in this case, it only considers the Magistrate Judge's additional findings briefly, and will do so below, as they arise.  Most notably, however, the Court agrees with the Magistrate Judge that counsel's failure to object to the trial court's decision to replace an already deliberating juror denied Ramjit the right to constitutionally effective counsel and constitutes an alternate ground upon which to conclude that a writ of habeas corpus should issue in this case.  Like the Magistrate Judge, the Court does not consider Ramjit's additional claims for ineffective assistance of trial and appellate counsel and of actual innocence.

Accordingly, the Court issues a writ of habeas corpus as follows.  The Respondent shall either: (1) set aside Ramjit's conviction, or (2) conduct another trial.  This shall be done within 180 days from the effective date of this Order.  On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

I.      **BACKGROUND**

The Court adopts the factual and procedural background of the case as laid out in the R&R,

*see* R&R, at 1-24, and, therefore, does not repeat that background here.[2]  To the extent necessary, portions of the factual and procedural background are highlighted below and wherever relevant in the opinion.

### A.    Factual Background

The Court briefly summarizes the facts central to its analysis.  The petitioner, Ramjit, first met the victim in the underlying matter, Clifford Beller ("Beller"), at a part-time job he obtained in high school.  Through Beller, Ramjit met several other young men, including Bobby Johnson, Jr. ("Johnson").  Ramjit and Johnson would later be indicted together for the aggravated murder of Beller, and each would be convicted in separate trials.  Ramjit challenges his conviction with his present petition for a writ of habeas corpus.

At some time prior to Beller's death, Johnson became involved in a rap group that consisted of some friends and family members, including his cousin, Laquan Stowers ("Stowers").  Eventually, there was a rift between Johnson and Stowers, and their various friends chose sides in the dispute.  Because Ramjit and Johnson had "developed a close friendship," Ramjit sided with Johnson.  Beller became more closely associated with Stowers.

On the night of January 12, 1999, Johnson and Ramjit became engaged in an altercation with some members of Stowers' group who came to Johnson's house to try to purchase marijuana (Johnson's house was located across the street from that of a friend of Stowers' group, where the

_____

[2]  The facts of the case relied upon in the R&R are the factual findings made by the Ohio appellate court on Ramjit's direct appeal in *State of Ohio v. Ramjit*, 2001 WL 128081 (Ohio App. Feb. 15, 2001), and they are presumed to be correct unless the petitioner rebuts their accuracy with clear and convincing evidence.  *See* 28 U.S.C § 2254(e)(1) ("a determination of a factual issue made by a state court shall be presumed correct."); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).  Because Ramjit has not sought to rebut the presumption of their correctness, the Court views the factual findings as accurate.

Stowers group had gathered). Although Johnson brandished a knife during the altercation, both groups eventually parted without any physical violence. Thereafter, Johnson and Ramjit left Johnson's house in Johnson's Cadillac. Beller left the house across the street soon thereafter to go to a party with a friend.

While Beller was at the party, he received several pages from Ramjit and a telephone call from Johnson. After the call, Beller informed his friend that he had to leave to "pick up some money." Beller first drove his friend home, leaving his friend's house at 11:00 p.m. When Beller was leaving, his friend saw him turn left on Sagamore Road rather than using "the more typical right turn" to Northfield Road.

A few hours later, at 1:20 a.m. on January 13, 1999, Beller's body was discovered in his car by a police officer at the Sagamore Grove picnic area. The officer noticed two bullet holes in the windshield area and saw that Beller "quite obviously was dead." The officer notified Metroparks of the occurrence of a possible homicide but, because of inclement weather that night, Ranger Sergeant John Manzatt ("Manzatt"), who was assigned to the case, did not arrive at the scene until approximately 2:30 a.m.

On January 14, 1999, Manzatt interviewed Johnson in connection with the murder. During that first interview, Johnson provided Ramjit's telephone number. Manzatt arranged for Ramjit to be interviewed by another ranger detective the following afternoon.

On the morning of January 15, 1999, Johnson's mother contacted Manzatt to arrange another interview with her son. This second interview with Johnson took place at nearly the same time Ramjit's was underway at another location. As a result of Johnson's statements to Manzatt, at the conclusion of their interviews, both Ramjit and Johnson were placed under arrest.

### B.     Procedural Background

The January 1999 term of the Cuyahoga County grand jury indicted Ramjit on one count of aggravated murder with a firearm specification. Ramjit pled not guilty to the indictment. Johnson was also indicted on one count of aggravated murder. Johnson also pled not guilty, and he was tried and convicted on that charge before Ramjit was tried for the same offense.

In Ramjit's trial, on October 29, 1999, the jury returned a verdict of guilty as charged in the indictment. He was sentenced to life without the possibility of parole for twenty years, plus three years incarceration on the firearm specification, to be served prior to and consecutively with the aggravated murder charge.

Ramjit filed a timely direct appeal in which he was represented by the same counsel as at trial, raising nine assignments of error on appeal.[3] The Ohio Eighth District Court of Appeals overruled Ramjit's nine assignments of error and affirmed his conviction and sentence on February 26, 2001. Ramjit, represented by new counsel, filed a timely appeal of the appellate court's decision to the Ohio Supreme Court, asserting five propositions of law in his memorandum in support of jurisdiction. The Ohio Supreme Court denied Ramjit's leave to appeal and dismissed the appeal as not involving any substantial constitutional question on June 27, 2001. Ramjit's motion for reconsideration in the Ohio Supreme Court was denied.

Ramjit then filed an application for reopening pursuant to Rule 26(B) of the Ohio Rules of Appellate Procedure, asserting that the appellate court did not consider the merits of a ground for ineffective assistance of counsel resulting from appellate counsel's deficient representation. Ramjit's

---

[3] Because this opinion does not analyze whether Ramjit has procedurally defaulted any of his claims, it does not detail the assignments of error and propositions of law raised by Ramjit on his various appeals.

application to reopen was denied on October 31, 2001.  Ramjit timely appealed the judgment of the

appellate court to the Ohio Supreme Court, asserting six propositions of law in his memorandum in

support of jurisdiction.  That appeal was dismissed by the Ohio Supreme Court on February 2, 2002,

as not involving any substantial constitutional question.  Ramjit then filed the present petition for

a writ of habeas corpus in this Court on February 6, 2002.

### 1.    Ground One - Confrontation Clause

In his petition for a writ of habeas corpus, Ramjit raised the following as his First Ground

for relief:

> Ground One: Petitioner was denied his 5th and 14th Amendment rights to due
> process and a fair trial, and his 6th Amendment right to confront and cross-examine
> witnesses against him, by the state's tactics in (a) announcing to the jury in opening
> statement that a co-defendant had already been convicted of the murder, and had
> given an out of court statement to the police implicating the petitioner as the shooter,
> (b) placing the previously convicted co-defendant on the stand, and forcing him
> repeatedly to assert his Fifth Amendment privilege in front of the jury in response to
> leading questions about the crime and his out of court statement to the police, (c)
> introducing the substance of the co-defendant's out of court statement through a
> police detective in a form not subject to cross-examination, and (d) urging the jury
> to find petitioner guilty based upon his co-defendant's invocation of the Fifth
> Amendment, the fact that a prior jury had already found the co-defendant guilty, and
> the fact that petitioner and the co-defendant were close, "inseparable" associates
> "hooked at the hip."

In examining Ground One of Ramjit's petition, the Magistrate Judge first determined that the

four subparts contained in Ground One actually constituted four separate claims and, accordingly,

subdivided the claims rather than treating them as only one ground for relief.  The four subparts all

relate to the alleged Confrontation Clause and due process violations, but the stage of trial at which

the alleged violations occurred, and the manner in which they occurred, differ.  The first subpart

involves comments made by the prosecution during its opening statement, the second relates to

7

Johnson taking the stand and asserting his Fifth Amendment privilege in response to questions about his statements to the police, the third relates to Sergeant Manzatt's testimony about the substance of Johnson's statements to the police, and the fourth relates to statements made by the prosecution in its closing.[4]

The Magistrate Judge determined that Ramjit had properly raised the second and third subclaims on direct appeal in state court (a conclusion Respondent does not dispute), but that he had failed to raise the first and fourth subclaims. The Magistrate Judge, therefore, found that the first and fourth subclaims had been procedurally defaulted. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1997) (federal habeas review generally is barred for "contentions of federal law . . . not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure."). The Magistrate Judge examined the merits of the second and third subclaims, recommending that this Court overrule the second subclaim and grant Ramjit's petition based on the third subclaim (as well as based on two of Ramjit's claims for ineffective assistance of trial counsel).

---

[4]  Because the Court ultimately determines that two of Ramjit's Confrontation Clause subclaims warrant habeas relief, it does not address whether it is proper to treat the four subparts of Ramjit's first ground as separate claims for purposes of a procedural default analysis; i.e., to address whether the first and fourth subparts are the "substantial equivalent" of the second and third subparts, *Picard v. Connor*, 404 U.S. 270, 278 (1971), or whether they "fundamentally alter" the claim presented, *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). As discussed below, however, the Court does not believe that, on the merits, subclaims two and three can be analyzed independently as the Magistrate Judge chose to do. Even if it is appropriate to consider the subclaims separately for purposes a procedural default analysis, the conduct at issue in those subclaims together deprived Ramjit of his right to Confrontation; considering each in a vacuum is artificial and misleading. The prosecution proffered Johnson's out-of-court confession through the double-pronged process of having Johnson take the Fifth in response to repeated questions regarding discussions with Manzatt <u>and</u> having Manzatt testify as to the precise content of those out-of-court statements. To treat the propriety of this evidence separately ignores its constitutional impact.

8

The Court addresses the second and third subclaims of Ground One, the bases of which are detailed below.

> **a.    Johnson's Assertion of his Fifth Amendment Privilege (Second Subclaim)**

During the course of the trial, the prosecution called more than thirty witnesses in its case-in-chief, including investigating officers, forensic scientists, acquaintances of Ramjit's and Johnson's, and representatives of the telephone company.  Bobby Johnson was one of the witnesses.  Johnson's testimony generally alternated between answering certain preliminary questions, asserting his Fifth Amendment right against self-incrimination, answering some more limited questions after being warned by the trial judge that he could not assert his privilege, finally refusing to answer any questions, and ultimately being dismissed before he was cross-examined.[5] (Tr. at 603-620).  On his first day of testimony, Johnson refused to answer the following questions:

Q:    Were you down in the park when Clifford Beller was killed?

*       *       *       *

Q:    Were you in Sagamore Grove Picnic Area when Clifford Beller was killed?  Did you hear the shots that killed Clifford Beller?

*       *       *       *

Q:    How many shots did you hear go into Clifford's head?

*       *       *       *

---

[5]  It is curious that the state trial judge would attempt to prohibit Johnson's invocation of his privilege against self-incrimination where, though convicted, Johnson had not yet exhausted his right to appeal from that conviction.  Had the trial judge not mistakenly assessed Johnson's right to assert a Fifth Amendment privilege, much of his objectionable testimony may have been avoided.

9

(Tr. at 623-626).

Later, the prosecutor showed Johnson unidentified documents and asked whether Johnson had seen them before, whether he wrote two of the pages, whether he had signed one of the documents, and whether the date, January 15, appeared next to Johnson's signature.  The prosecutor also asked whether Johnson remembered meeting with detectives on that day.  Johnson was either non-committal or stated that he could not recall in response to the state's questions. (Tr. at 641-649). A comparison between those questions and the *Supplement (Interviews & Statements) to Response to Warden's Objections* (Doc. # 55), which were filed in this Court by Ramjit, reveals that the prosecutor's questions came from a written statement Johnson had given to police on January 15, 1999, two days after Beller's death.  The following questions are taken nearly verbatim from Johnson's statement:

Q:      Okay.  Now, do you remember telling them on this paper that on this date Cliff was across the street - -

MR. PETERSON (defense counsel): Objection, your Honor.

THE COURT:          Overruled.  Go ahead.

A:      Go ahead.

Q:      That Cliff was across the street of 670 Johnson Avenue with three adults named Laquan, Snoop, Sean? Do you remember telling them that?

A:      I don't recall.

Q:      Well, is that true?

A:      I don't recall.

                    *       *       *       *

Q:      Do you remember writing that down for the police?

10

A:      I don't recall.

Q:      And the next sentence is "Ren[6] and me walked to my car that was on the street."

        *       *       *       *

Q:      And you remember meeting with the police and talking about Clifford Beller's death, don't you?

A:      I remember when I got arrested.

Q:      Well, even before you were arrested, you were meeting with the police and talking with them, isn't that correct?

A:      They talked to several people.

Q:      And you were one of those people, right?

A:      Yes. There was a lot of people.

Q:      And you remember going out to the police station with your mom and talking with the police and sitting down and making out this statement, right?

A:      I believe talking to the police.  Yeah.

Q:      Okay.  Now, and you know the day before Clifford Beller became deceased that you were across the street with Ren and that you walked to your car that was parked near Mary Ellen's house right?

A:      No. I don't recall what you are talking about.

Q:      That's what you told the police here, isn't it?

A:      I don't recall.

Q:      And this doesn't refresh your recollection at all?

A:      No, sir.  Is this my statement?  That's what you trying to say?

Q:      Well, I am asking you.  Do you recognize this as your statement?

---

[6] "Ren" is Surendra Ramjit's nickname.

11

A:     I don't recall.

*       *       *       *

Q:     I think this copy is just fine, because it is in your own handwriting.

A:     Do you think so?

Q:     Yeah, I think so.

A:     Let's go on to the next sentence.

(Tr. at 645-649).

At that point, defense counsel objected, approached the bench, and the court was adjourned for the day.  The next morning, Johnson immediately asserted his Fifth Amendment privilege in response to the first question asked of him, and continued to refuse to answer on those grounds. Prior to Johnson's testimony that morning, the court had declared Johnson a court's witness and allowed the state to examine him as on cross-examination (Tr. at 668).  After he asserted his Fifth Amendment rights, the court dismissed Johnson as a witness, and he did not return to courtroom for the duration of the trial.  (Tr. at 709).

**b.     Manzatt's Testimony about Johnson's Statements (Third Subclaim)**

Later in the trial, the state called Manzatt, the detective who investigated Beller's murder. Upon cross-examination,  Peterson, Ramjit's defense counsel, asked Manzatt about the presence of investigators at the crime scene the morning of the murder:

Q:     And what about the police cars that were there that tracked over that snow and police officers walking around?  Would it be a fair statement that's true?

A:     In a specific area, yes.

Q:     And you cannot sit there, Officer, can you, and tell us how many people were in that MetroParks when this homicide took place at that scene?

MR. RUKOVENA (prosecutor):     Objection, your honor.

THE COURT:     Overruled.

Q:     Can you?

A:     I learned from Bobby Johnson that there was just three people there.

Q:     No sir.  I didn't ask you about Bobby Johnson.  I asked you from your investigation of the fingerprints --

MR. RUKOVENA:   Objection, your Honor.

THE COURT:     He may answer the question.  You asked it.  He may answer it.  Go ahead, sir.

A:     I learned from Bobby Johnson that at the time of the homicide there were three people there.  Bobby Johnson, Surrendra Ramjit, and the victim, Clifford Beller.

Q:     And Bobby Johnson was convicted of aggravated murder in this case, was he not?

A:     Yes.

Q:     And he said to you that he had nothing to do with this homicide at one time, did he not?

(Tr. at 1087-1089).

After this series of questions, Peterson continued with his cross-examination of Manzatt. When he was finished, the prosecution conducted its redirect examination, asking the following questions about what Johnson had told Manzatt:

Q:     Mr. Peterson asked you about what Bobby Johnson told you happened that night, didn't he?

MR. GASPER (defense counsel):  Objection.

13

THE COURT:  Overruled.

A:  Yes.

Q:  And Bobby Johnson did in fact tell you what happened that night, didn't he?

A:  Yes.

Q:  And Bobby Johnson gave you a written statement that he printed part of with his own hand, did he not?

A:  Yes, sir.

*     *     *     *

Q:  And what did Bobby Johnson tell you he was doing when he heard the first shot?

(Tr. at 1101-1102).

At this point, defense counsel objected and the court discussed the matter of Manzatt's testimony outside the presence of the jury.  After adjourning for the day and reviewing the transcript of Peterson's cross-examination of Manzatt, the court ruled that the prosecution could ask Manzatt questions regarding what Johnson told him about the night of Beller's death.  The court reasoned that defense counsel had "opened the door" to such questions because (1) defense counsel asked Manzatt, "[a]nd he (Johnson) said to you he had nothing to do with this homicide at one time, did he not?" (emphasis added), and (2) defense counsel did not move to strike Manzatt's prior answer that "I learned from Bobby Johnson that there was just three people there."  Based on those two exchanges, the trial court ruled that defense counsel had "opened the door" to questions about Johnson's out of court statements to the police.  (Tr. at 1103-1133).  When the redirect examination resumed, the prosecution asked Manzatt the following questions:

Q:  What did Bobby Johnson tell you happened in the park there that night that resulted in Clifford Beller being shot to death?

14

MR GASPER:        Object.

THE COURT:        Overruled.

A:      I learned from Bobby Johnson that he pulled into the parking lot with Surendra
        Ramjit and the victim Clifford Beller, the he was stuck in the snow for a minute
        with his vehicle, and that Clifford Beller, the victim, pushed him and assisted him
        out of the snow and he was able to then pull up out of the parking lot.  And as he
        reached the street he heard several gunshots, a pause and then Surendra Ramjit ran
        up and jumped in the vehicle with him and said "I just shot Clifford Beller.  Take
        me home." . . .

(Tr. at 1133).

## 2.        Ground Two – Ineffective Assistance of Trial Counsel

As his Second Ground for relief, Ramjit raised the following ground:

Ground Two: Petitioner was denied his 6th and 14th Amendment Right to the effective
assistance of counsel at trial due to his attorneys' (1) **failure to object and/or move to
strike non-responsive hearsay answers volunteered by the prosecution's homicide
investigator regarding what co-defendant Bobby Johnson told him about the
murder, and then asking an alleged "door-opening" question which gave the
prosecutor a pretext for introducing Johnson's entire, unsworn, out of court
statement**, (2) failure to object to testimony and photographs of petitioner's tatoos, which
were used by the prosecutor as character evidence of [his] propensity to commit murder,
(3) **failure to move for a mistrial after the court dismissed one of the regular jurors
for cause during deliberations, and after all alternatives had been excused**, (4) failure
to demand a voir dire of the remaining eleven jurors to determine whether the dismissed
juror had tainted their deliberations, (5) failure to ask for an instruction that the re-
constituted jury begin deliberations anew, (6) failure to object to numerous instances of
prosecutorial misconduct, and (7) failure to object to hearsay testimony not based upon
the personal knowledge of the witness.

Although the Magistrate Judge found that "[t]he cumulative errors of Ramjit's counsel

were so serious as to have deprived Ramjit of a fair trial whose result is reliable," she directly

addressed only the first and the third subparts of Ground Two.  On both of those subparts, the

Magistrate Judge determined that Ramjit's trial counsel had been constitutionally deficient, and

15

that, even assuming *arguendo* that there was no Confrontation Clause violation, the errors of

Ramjit's counsel were so serious that Ramjit was deprived of a fair trial whose result was

reliable.  She did not address specifically the five other subparts of Ground Two.

As to the first subpart – failure to move to strike Manzatt's non-responsive answer and

asking an allegedly "door-opening" question – the portion of the transcript reciting those

exchanges has already been recounted above.  *See infra*, I.B.1.b.  As to the third subpart, that

claim arises from the trial court's dismissal of a regular juror and substitution of an alternate

juror after deliberations had begun.  The trial court gave the case to the jury for deliberations on

Thursday, October 28, 1999, dismissing the alternate jurors at that time.  One day later, on

Friday, October 29, 1999, one of the jurors told the trial judge, *in camera*, that she had seen a

man with the Ramjit family, and that a look from that man convinced her that she would not be

safe if she found against Ramjit.  The juror indicated that she would not be able to deliberate

impassionately to a verdict in the case, and she was dismissed.  The court contacted the first

alternate juror, who told the court she could be available by late afternoon.  The juror joined the

venire that afternoon without any additional instructions being given, and without an objection to

this procedure by the defense.  Later that same day, October 29, 1999, the jury returned a guilty

verdict.

## II.    LEGAL STANDARD

The Court's review of Ramjit's petition for a writ of habeas corpus is governed by the

Antiterrorism and Effective Death Penalty Act (AEDPA), codified at 28 U.S.C. § 2254(d).  In

relevant part, the AEDPA provides that

(d) [a]n application for a writ of habeas corpus on behalf of a person in custody

pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*

A state-court decision is considered contrary to federal law "if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  The application of federal law is unreasonable where "the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  When assessing unreasonableness, "a federal habeas court may not issue a writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.

## III.    CONFRONTATION CLAUSE

As indicated above, the Court examines only two of Ramjit's subclaims of his First Ground for relief:  subparts (b) and (c).  Because the Court adopts the Magistrate Judge's finding as to Johnson's third subclaim of Ground One (subpart (c)), the Court begins with a discussion of that subclaim before turning to Ramjit's second subclaim of Ground One (subpart (b)).

As a preliminary matter, the Court notes that there has been substantial change in

17

Confrontation Clause jurisprudence since Ramjit's trial in 1999. *See Crawford v. Washington*, 541 U.S. 36 (2004). In *Crawford*, "the Supreme Court overruled nearly twenty-five years of *Ohio v. Roberts* precedent finding out-of-court statements which are testimonial in nature to be barred by the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court." *United States v. Katzopoulos*, 437 F.3d 569, 574 (6th Cir. 2006).

The question in the present case, however, is whether the testimony at issue was admitted contrary to, or involving an unreasonable application of, clearly established Supreme Court precedent when petitioner's conviction became final in 1999. *See Teague v. Lane*, 489 U.S. 288, 310 (1989). The Sixth Circuit has determined that *Teague* prohibits a habeas petitioner from "availing himself of the new rule articulated in *Crawford*." *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005); *see also Brandt v. Curtis*, 138 Fed.Appx. 734, 739 n.4 (6th Cir. 2005) ("In spite of petitioner's efforts to argue otherwise, the Confrontation Clause analysis from *Crawford* does not govern this case since *Crawford* was decided long after petitioner's trial, and this Court has ruled that *Crawford* does not apply retroactively.") Accordingly, *Crawford* does not apply retroactively to the present case, and this Court examines clearly established Supreme Court precedent at the time of Ramjit's conviction.

### A.     Manzatt's Testimony about Johnson's Statements (Third Subclaim)

Ramjit argues that "the state's tactics in . . . introducing the substance of the co-defendant's out of court statement through a police detective in a form not subject to cross-examination" violated Ramjit's Sixth Amendment right to confront and cross-examine witnesses against him, and his Fifth and Fourteenth Amendment rights to due process and a fair trial. Ramjit contends that the introduction of Johnson's extrajudicial, hearsay statement through Detective Manzatt, when Johnson

18

was unavailable for cross-examination, violated the Confrontation Clause because the statement bore

no "indicia of reliability" as required by Supreme Court precedent.  *See Ohio v. Roberts,* 448 U.S.

56, 66 (1980).  Ramjit argues that the "door opening" theory relied upon by the trial court, and

embraced by the Ohio Eighth District Court of Appeals, does not satisfy the requirements for the

introduction of a statement that otherwise violates the Confrontation Clause.  On the other hand,

Respondent simply argues that the state court's analysis as to "opening the door" was correct and

should not be disturbed.

The Magistrate Judge agreed with Ramjit.  The Magistrate Judge first noted that Johnson's

out-of-court statement was deemed admissible not because it bore any "indicia of reliability" under

*Ohio v. Roberts*; rather, it was admitted solely on the theory that defense counsel had "opened the

door" to its admission.  Even under that theory, the Magistrate Judge reasoned, the statement should

not have been admissible because any effect of "opening the door" in this case was actually

prejudicial to Ramjit, in that Manzatt testified that Johnson told him that only three people were at

the crime scene: Ramjit, Beller, and Johnson.  The Magistrate Judge concluded that a finding by the

trial court that such testimony opened the door and permitted the prosecution to explore the details

of Johnson's out-of-court statements was simply erroneous.  The effect of the trial court's ruling,

therefore, was that the defendant implicitly waived his Sixth Amendment right of confrontation, a

result that is not supported either by the record or applicable law.  Finally, the Magistrate Judge

concluded that, even if, as Respondent argues, this claim should be analyzed in terms of the due

process requirement of fundamental fairness, the admission of Johnson's statements still warrants

habeas relief.  Johnson's statement was the most damaging evidence presented against Ramjit, and,

indeed, constituted the <u>only</u> evidence that identified Ramjit as the shooter.  As such, its wrongful

admission denied Ramjit the right to a fair trial.  *Pointer v. Texas*, 380 U.S. 400, 404-05 (1965).

Respondent's objections to the R&R on this claim are minimal and unpersuasive.  The overwhelming majority of Respondent's objections to the R&R (Doc. #43), and the <u>entirety</u> of Respondent's reply to petitioner's objections (Doc. #56), are dedicated solely to the issue of ineffective assistance of counsel.  Respondent's <u>only</u> objection to the R&R's conclusion that the Confrontation Clause was violated is that, in addition to the standard of "indicia of reliability" laid out in *Ohio v. Roberts*, there is another recognized exception not considered by the Magistrate Judge.  Respondent argues that, "[i]n the appropriate circumstances and with the appropriate amount of careful control, out-of-court statements that might otherwise violate the Confrontation Clause may be used without violating a criminal defendant's right to a fair trial if the statements are used as part of a legitimate defense strategy."  To support that contention, Respondent cites to Tenth Circuit cases.  *See Hawkins v. Hannigan*, 185 F.3d 1146 (10th Cir. 1999); *Bullock v. Carver*, 297 F.3d 1036 (10th Cir. 2002).  Those cases, however, relate to claims for ineffective assistance of counsel, not Confrontation Clause violations, and this Court knows of no other authority that would support Respondent's contention.  Respondent's factual support for this "it was all part of the defense strategy" theory is similarly weak.  Indeed, it is based on misstatements and mischaracterizations of the record which are so blatant they border on the unethical.  Respondent's objections as to this issue, therefore, are not well-taken.

The Court hereby adopts the thorough and well-reasoned recommendation of the Magistrate Judge, and adds the following analysis only for emphasis.  As the Magistrate Judge noted, a defendant's right to confront witnesses against him is "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."  *Pointer v. Texas*, 380 U.S. 400, 405

20

(1965).  Under *Ohio v. Roberts*, the controlling precedent at the time of Ramjit's conviction, only those statements that bear an "indicia of reliability" may be admitted when a hearsay declarant is not available for cross-examination.  *Roberts*, 448 U.S. at 66.  Statements have been deemed to possess an indicia of reliability if they (1) "fall[] within a firmly rooted hearsay exception, or (2) if there is a "showing of particularized guarantees of trustworthiness."  *Id.*

In this case, Johnson's out of court statements do not satisfy either of the standards set forth in *Ohio v. Roberts*.  To the extent that Johnson's statements can be considered as statements against penal interest and, therefore, exceptions to the hearsay rule, the Supreme Court has determined that these particular types of statements against penal interest (offered by the prosecution to establish the guilt of an alleged accomplice of the declarant) are "inherently unreliable."  *Lilly v. Virginia*, 527 U.S. 116, 127-31 (1999).[7]  Johnson's statements, therefore, do not fall within a firmly rooted hearsay exception; indeed, clearly established Supreme Court precedent on this matter "consistently ha[s] viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those 'hearsay exceptions that are so trustworthy that adversarial testing can be expected to add little to the statements' reliability.'" *Id.* at 134 (citation omitted).   As to whether the statements possess any other guarantees of trustworthiness, the Supreme Court has "spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants." *Lee v. Illinois*, 476 U.S. 530, 541 (1986); *Lilly*, 527 U.S. at 131; *see also Bruton v. United States*, 391 U.S. 123 (1968).  In this case, there is no evidence to  rebut the presumption that Johnson's out of court statements were unreliable; indeed, other evidence indicates that Johnson or

---

[7]  *Lilly v. Virginia* was announced before Ramjit's trial and actually was cited to the trial judge by defense counsel when the trial judge was considering whether Manzatt could testify as to Johnson's out-of-court statements.

his counsel made affirmative efforts to incriminate Ramjit, even during the investigation of the murder.[8]  Johnson's statements, therefore, do not bear the "indicia of reliability" required by *Ohio v. Roberts*.

In light of the Supreme Court jurisprudence outlined above, the state appellate court's determination that Ramjit's right to confrontation had not been violated was contrary to clearly established Supreme Court precedent.  Neither the trial court nor the state appellate court considered or applied the standards set forth in *Ohio v. Roberts,* nor did they follow the clear admonitions in *Lee v. Illinois* and *Lilly v. Virginia* against the use of accomplices' confessions that incriminate defendants.  Rather, those courts determined that the introduction of Johnson's statements was permissible solely on the ground that defense counsel "opened the door" to their introduction under the doctrine of "invited error."  *See State of Ohio v. Ramjit*, 2001 WL 128081 at *6 (Ohio App. Feb. 15, 2001)  As to the doctrine of invited error, this Court adopts the R&R's analysis that the doctrine of invited error does not correct the constitutional violation that occurred when Johnson's statement was admitted through Manzatt's testimony.  *See* R&R, at 47-49.  The Court notes only that, to the extent that the invited error occurred when defense counsel asked Manzatt whether Johnson had ever claimed he had nothing to do with the homicide, the conclusion remains the same.  Respondent cites

---

[8] For example, four days after the murder, Johnson's attorney called the police to ask if they had found a pair of gloves at the scene of the murder.  Based on that call, the police went to the crime scene and found a pair of previously undiscovered gloves, with what was later to be identified as Ramjit's blood on them.

to no exception in clearly established Supreme Court precedent that would support such a finding.[9]

In light of the foregoing, the Court adopts the R&R as to Ramjit's third claim of his first ground for relief, finding that this claim merits relief in habeas corpus.

**B.      Johnson's Assertion of his Fifth Amendment Privilege (Second Subclaim)**

As to Ramji's second claim, he argues that the "state's tactics in . . . placing [Johnson] on the stand, and forcing him repeatedly to assert his Fifth Amendment privilege in front of the jury in response to leading questions about the crime and his out of court statement to the police," violated Ramjit's Sixth Amendment right to confront and cross-examine witnesses against him, and his Fifth and Fourteenth Amendment rights to due process and a fair trial.  To support this argument, Ramjit relies primarily on *Douglas v. Alabama*, 380 U.S. 415 (1965), in which the Supreme Court found, in similar circumstances, that the petitioner's right to confront the witnesses against him had been violated.

The Court recites extensive portions of *Douglas* because of its striking similarity to the present case.  In *Douglas*,

> [t]he petitioner and one Loyd were tried separately in Alabama's Circuit Court on
> charges of assault with intent to murder.  Loyd was tried first and was found guilty.
> The State then called Loyd as a witness at petitioner's trial.  Because Loyd planned
> to appeal his conviction, his lawyer, who also represented petitioner, advised Loyd
> to rely on the privilege against self-incrimination and not to answer any questions.
> When Loyd was sworn, the lawyer objected, on self-incrimination grounds, 'to this
> witness appearing on the stand,' but the objection was overruled.  Loyd gave his
> name and address, but, invoking the privilege, refused to answer any questions
> concerning the alleged crime.  The trial judge ruled that Loyd could not rely on the

---

[9]  Like the Magistrate Judge, moreover, this Court is at a loss to understand how the trial court concluded that defense counsel opened the door to anything in this case.  Indeed, it is clear that Manzatt improperly injected testimony that was <u>not</u> elicited into the record and that defense counsel used a brief follow-up question in an effort to diffuse the damning effect of Manzatt's improper testimony.

23

privilege because of his conviction, and ordered him to answer, but Loyd persisted in his refusal.  The judge thereupon granted the State Solicitor's motion 'to declare (Loyd) a hostile witness and give me the privilege of cross-examination.'  The Solicitor then produced a document said to be a confession signed by Loyd.  Under the guise of cross-examination to refresh Loyd's recollection, the Solicitor purported to read from the document, pausing after every few sentences to ask Loyd, in the presence of the jury, 'Did you make that statement?'  Each time, Loyd asserted the privilege and refused to answer, but the Solicitor continued this form of questioning until the entire document had been read.  The Solicitor then called three law enforcement officers who identified the document as embodying a confession made and signed by Loyd.  Although marked as an exhibit for identification, the document was not offered for evidence.

*Id.* at 416-417

In finding that these actions constituted a Confrontation Clause violation, the Court

determined that

petitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause.  Loyd's alleged statement that the petitioner fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof of both petitioner's act and of the requisite intent to murder.  Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true.

*Id.* at 419.

Further, the Court determined that the petitioner's opportunity to cross-examine the law

enforcement officers did not redress the denial of his essential right under the Confrontation Clause.

*Id.* at 419-20.

The Magistrate Judge found Ramjit's reliance on *Douglas* to be misplaced, distinguishing

*Douglas* from Ramjit's case in two ways. First, the Magistrate Judge found that the accomplice in

24

*Douglas*, Loyd, asserted his Fifth Amendment rights at the moment he was sworn and <u>before</u> being examined, such that the prosecutor in that case knew in advance that Loyd would refuse to answer his questions.  By contrast, the Magistrate Judge concluded that it was not clear that the prosecution knew that Johnson would assert his Fifth Amendment rights, and that the continued examination of Johnson, accordingly, was "not necessarily done in bad faith."  Second, the Magistrate Judge determined that the questions asked by the prosecution of Johnson did not imply facts which, by themselves, implicated Ramjit.[10]  In *Douglas*, the statements read by the Solicitor were detailed and named the petitioner as the shooter; whereas, in the present case, the implied facts did "little to incriminate Ramjit, and most of those implied facts were established by other witnesses."  The Magistrate Judge concluded that, "[e]ven if the jury impermissibly understood Johnson's refusals to answer as admissions of facts sought by the prosecutor, the damage to Ramjit's case would have been minimal."  The Magistrate Judge, therefore, recommended overruling this second claim for relief.

Ramjit, of course, objects to the R&R's conclusion on this issue.  As to the Magistrate

---

[10]  The Magistrate Judge found that the prosecutor's unanswered questions implied the following facts:

> Johnson was familiar with the Kin Folk (the rap group).  Johnson knew Ramjit and knew that Ramjit and Beller had worked together at Builder's Square.  Johnson washed his car soon after the murder.  Johnson considered Beller a good friend and knew what kind of car Beller drove.  Johnson was in the Sagamore Grove Picnic Area when Clifford Beller was killed and heard the shots that killed Beller.  Johnson saw Beller after he had been shot.  Johnson spoke with the Metropark police on January 15, 1999 and with Detective Manzatt on November 15, 1999.  Johnson gave one or more written and signed statements to the police.  Johnson told the police that on January 12, 1999, Beller and three others were across the street from Johnson's house at "Mary Ellen's" house.  At that time, Johnson and Ramjit walked out to Johnson's car, parked in the street.

(R&R at 42-43).

Judge's reliance on the fact that the prosecutor did not necessarily act in bad faith because he did not know that Johnson would invoke his privilege, Ramjit argues that bad faith is irrelevant because *Douglas* does not require such a finding.  According to Ramjit, the constitutional violation occurred because the jury heard Johnson's refusal to answer certain questions, not because the prosecutor intended that result.  As to the second distinguishing feature the Magistrate Judge found between the present case and *Douglas* (that the implied facts were only minimally damaging), Ramjit argues that, even though the questions themselves did not implicate Ramjit as the shooter, the content of Johnson's statement had already been revealed to the jury in the prosecution's opening statement and was later discussed in detail in Manzatt's testimony.[11]  As such, Ramjit argues, the questions did not need to be as detailed as those in *Douglas* to have the same incriminating effect.

---

[11] During his opening statement, the prosecutor, Rukovena, told the jury the following, over the objection of defense counsel, Peterson:

> MR. RUKOVENA:    . . . I anticipate that Bobby Johnson is going to testify that --

>    MR. PETERSON:    Objection

>    THE COURT:    Overruled.

> MR. RUKOVENA:   – that on that night . . . as he, Bobby Johnson, was exiting the Sagamore Grove parking lot area out onto Sagamore Road he, Bobby Johnson, was shocked when he heard these series of shots, and that he stopped and Surendra Ramjit came running over to his car and got into his car and said go.  And that as he, Bobby Johnson, pulled out of the driveway and onto Sagamore Road . . . this defendant tells him he shot Cliff and that if Bobby says anything he is going to kill him.

(Tr. at 108-110).

In all, Rukovena's statements about what he anticipated Bobby Johnson would testify to covered almost three full transcript pages.  The Magistrate Judge found that Ramjit's claim as to the opening statement had been procedurally defaulted; the Court, therefore, does not address this claim independently, *see infra*, note 3, but considers it only in connection with Johnson's second subclaim of his First Ground for relief.

26

On this claim, the Court disagrees with the Magistrate Judge and finds that Johnson's assertion of his Fifth Amendment rights in the face of Manzatt's direct testimony regarding the substance of Johnson's out-of-court confession directly and damningly implicated Ramjit in the crime. First, Ramjit is correct that the Magistrate Judge placed too much emphasis on the lack of bad faith on the part of the prosecutor in this case. This is true for two reasons. First and foremost, *Douglas* is not solely, or even primarily, a prosecutorial misconduct case. *Douglas*' primary concern was not the manner in which Loyd's out-of-court statements were placed before the jury, it was the fact that they were placed there in violation of the Confrontation Clause. To the extent *Douglas* does discuss concepts of prosecutorial misconduct, moreover, a prosecutor's bad faith is only one of several factors to consider in determining whether such misconduct has occurred. *See United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976), *overruled on other grounds*, *United States v. Stone*, 748 F.2d 667, 678-83 (6th Cir. 1984). The Court's decision must be based on a totality of the circumstances, including such factors as

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.*

Whether the statements were "deliberately or accidentally placed before the jury," therefore, is only one factor. As Ramjit contends, moreover, it is doubtful whether the prosecutor was, in fact, unaware that Johnson would assert his Fifth Amendment privilege; the record just as readily supports the contrary conclusion.[12] For all of these reasons, the Court does not find that this ground

---

[12] At a minimum, the Court finds Respondent's claim that "the prosecution demonstrated a laudable respect for the Confrontation Clause" wholly unsupportable.

27

distinguishes the present case from *Douglas* to a significant extent.

The Court is also compelled to disagree with the Magistrate Judge's conclusion that this case differs from *Douglas* because the testimony elicited from Johnson, standing alone, did not directly implicate Ramjit in the shooting.  To analyze this issue properly, the Court finds it must consider the Supreme Court's decision in *Richardson v. Marsh*, 481 U.S. 200 (1987), a case neither cited to nor considered by the Magistrate Judge.  In *Richardson*, two codefendants, Marsh and Williams, were charged with murder, robbery, and assault, and they were tried jointly.[13]  At trial, Williams' written confession was admitted over objection, but Williams did not testify.  The confession had been redacted to omit all reference to Marsh, and the jury was admonished not to use the confession in any way against Marsh.  The confession, however, described a conversation between Williams and a third accomplice in a car in which they discussed the possibility of having to kill their victims; Marsh's later testimony placed herself in that car during the conversation (although she claimed not to hear the conversation over the radio).  The prosecutor, in closing arguments, linked Marsh to the portion of Williams' confession describing the conversation in the car, thereby placing her in the car during that conversation.  The jury ultimately convicted Marsh of two counts of felony murder in the perpetration of an armed robbery and one count of assault with intent to commit murder.

On her subsequent petition for a writ of habeas corpus, Marsh argued that introduction of Williams' confession violated her right to confront witnesses against her.  The Court began its

_____

[13]  Although *Richardson* involved a <u>codefendant's</u> statement at a <u>joint trial</u> rather than an accomplice's statement at a separate trial, as was the case here, *Richardson* is equally applicable because an accomplice's statement that incriminates the defendant is still at issue; simply because the declarant is not also on trial does not render the statement any less incriminating to the defendant who is on trial.  *See United States v. Macias*, 387 F.3d 509, 516-17 (6th Cir. 2004) (applying *Richardson* where the statement was made, not by a co-defendant at a joint trial, but by a co-conspirator who had already pled guilty).

analysis with an examination of *Bruton v. United States*, 391 U.S. 123 (1968), in which the Court held that "a defendant is deprived of his Sixth Amendment right of confrontation when the <u>facially incriminating</u> confession of a non-testifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson*, 481 U.S. at 208 (emphasis added).  The *Richardson* Court emphasized that the holding in *Bruton* was premised on the fact that, although an instruction to the jury that it should not consider evidence against a certain defendant is generally presumed to be effective, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 207 (quoting *Bruton*, 391 U.S. at 135-36).

The Court, however, did not extend *Bruton* to the facts of *Richardson* because "the confession was not incriminating on its face, <u>and became so only when linked with evidence introduced later at trial</u> (the defendant's own testimony)." *Id.* at 208 (emphasis added).  Where a confession incriminates a codefendant on its face, the Court reasoned, it is more difficult for a jury to "thrust [the incriminating evidence] out of mind" when instructed to do so by the judge.  *Id.* Where the confession becomes incriminating only when linked to other evidence from sources other than the non-testifying accomplice, however, a jury instruction may well be successful.  *Id.*  The Court went on to hold that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  *Id.* at 211.

Arguably, the Magistrate Judge's conclusion that Johnson's testimony never touched on the

critical issue of Ramjit's involvement in the shooting would place this case within the realm of *Richardson* - i.e., where the non-testifying defendant's statements are not facially incriminating.  One could argue, accordingly, that the admission of Johnson's testimony did not violate the Confrontation Clause because its real evil lies in the implications the jury could (and likely did) draw from it, <u>when linked</u> with what the jury heard in the prosecutor's opening statement and with Manzatt's testimony discussing Johnson's confession.

As a preliminary matter, to even reach a *Richardson* analysis in this case, the Court must first determine whether Johnson's assertion of his Fifth Amendment privilege is equivalent to a statement or testimony that could form the basis of an "incriminating inference" – i.e., whether the facts implied from Johnson's refusal to answer questions can be considered testimony of Johnson's actual statement.

In *Douglas*, the Court held that

> [a]lthough the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, <u>the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance on the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true.</u>

*Douglas*, 380 U.S. at 419 (emphasis added).

Just as in *Douglas*, the prosecutor in the present case read nearly verbatim from Johnson's written statement during portions of the examination.  The prosecutor, for example, prefaced one question with, "and the next sentence reads . . ." before asking the question, making it clear to the jury that his question was being drawn from Johnson's own written statement.  Just as in *Douglas*, Johnson refused to answer questions as to whether he remembered writing the sentences being read to him.  The Court finds, therefore, that Johnson's assertion of his Fifth Amendment rights "may

30

well have been the equivalent in the jury's mind of testimony that [he] in fact made the statement . . . and that it was true." *Id.*

Next, the Court must determine whether Johnson's statement was <u>facially incriminating</u>, such that this case would fall under *Bruton*, and no jury instruction could cure the Confrontation Clause violation; or whether it became incriminating only after being linked with other unrelated evidence, such that this case would fall under *Richardson,* and an appropriate jury instruction could effectively protect Ramjit's right of confrontation.  Unlike in *Douglas*, where the portion of the statement read to the jury (in the guise of a question) directly implicated the defendant as the shooter, the portions of the statement read to Johnson in this case only pertained to preliminary details about the evening of the murder.  Johnson was dismissed as a witness before the prosecutor reached the portions of the statement directly implicating Ramjit as the shooter.  Ramjit, nonetheless, argues that, when considered with other testimony or statements heard by the jury – the prosecutor's opening statement and Manzatt's testimony – the facts implied by Johnson's refusal to answer clearly incriminate Ramjit.  In other words, the jury heard both the prosecutor and Manzatt say <u>that Johnson said that Ramjit shot Beller</u>, and they heard the equivalent of Johnson taking the stand and admitting to making the statement and saying it was true.  When linked together, Ramjit argues that there is a direct implication that he shot Beller which the jury could not escape.

After careful consideration, the Court finds that this case is governed by *Douglas*, not *Richardson*.  The issue raised is not whether a colloquy with a codefendant who asserts the Fifth <u>alone</u> implicates the defendant in the murder, but whether the state may introduce, in any fashion, a codefendant's out-of-court confession where that confession directly implicates the defendant.  Here, even if one disregards the prosecution's opening statement, the state's evidence established

that Johnson gave a detailed out-of-court statement regarding the events of the murder and that, in that statement, he placed the murder weapon directly in the defendant's hands.  The fact that the state used two witnesses (Johnson and Manzatt) to flesh out the fact and full content of this confession does not alter its character as *Bruton* evidence.  Unlike *Richardson*, this is not a case in which evidence <u>independent</u> of a facially neutral confession ties the defendant to the events described in the confession (in *Richardson*, it was the defendant's own testimony placing herself in the car with her accomplices).  This is a case, instead, where, even if it is true that Johnson's own testimony did not directly incriminate Ramjit, that testimony confirmed the existence of an out-of-court confession, described in detail by Manzatt, which directly and pointedly incriminated Ramjit.

This case differs from *Richardson* in another material respect, moreover.  In *Richardson*, the question posed by the Court was whether the introduction of an accomplice's out-of-court confession could ever survive a Confrontation Clause challenge.  The Supreme Court concluded that it could if two things were true – first, that the out-of-court confession was sanitized so as to exclude all reference to the defendant (i.e., so that it was not facially incriminating as to the defendant) <u>and</u> the jury was instructed that they were not to consider the accomplice's out-of-court statements as substantive evidence against the defendant.

In this case, however, no limiting instruction was given to the jury regarding Johnson's out-of-court statements.   The trial court did not instruct the jury that it was not to consider Johnson's assertions of his Fifth Amendment rights as substantive evidence against Ramjit.  A key component of *Richardson*, therefore, is missing from the present case.  "That [the jury instruction component] is an essential element of the Court's holding in *Richardson* is undeniable."  *Mikesell v. Conley*, 51 Fed. Appx. 496, 505 (6th Cir. 2002).  The fact that such an instruction was not given here may

32

"remove[] the case from the permissible practice described in *Richardson* and bring[] it within the realm of *Bruton*."  *Id.*

The trial transcript reveals that defense counsel actually requested such an instruction, but the trial court did not ultimately give one, either after Johnson's "testimony" or at the close of trial before the jury began deliberations.   The following exchanges occurred relating to the potential instruction (outside of the presence of the jury):

MR. GASPER:    If he (Johnson) maintains the same position, your Honor, the best that [this] is is impeachment against Bobby Johnson, not substantive evidence against our client (Ramjit). Therefore, the Court would have to give an instruction to the jury --

THE COURT:     And I will give an instruction.

MR. GASPER:    Your Honor, we don't think there is any instruction in [the] world that could cure what is in that written statement about our client . . .

*              *              *              *

THE COURT:     . . . And I will instruct the jury - - well, we will see what he says, but if he, depending on how it is, I certainly would entertain Mr. Gasper's suggestion that there be an instruction limiting the use of his testimony.  In other words, that it is not substantive evidence.  So you each can actually fashion an instruction after he testifies, if you care to, and we will have a look at it. . . .

(Tr. at 661, 667).

After the Court dismissed Johnson as a witness, the trial court did not give an instruction to the jury not to consider Johnson's testimony as substantive evidence against Ramjit.  At the close of the trial, moreover, the trial court's instructions to the jury did not include reference to permissible inferences to be drawn from a witness asserting his Fifth Amendment privilege.  Based on the absence of such an instruction, even if otherwise governed by *Richardson* (which the Court has

33

concluded it is not), it appears it was taken from the "permissible practice of *Richardson*" and brought "within the realm of *Bruton*" by the trial court's failure to provide the very limiting instruction it promised.[14]

The Court, therefore, finds that the second subclaim of Ramjit's First Ground for relief, when considered in connection with the third subclaim, as it must be, further exacerbates the Confrontation Clause violation that occurred in his state trial.  Accordingly, the Court determines that Ramjit is entitled to a writ of habeas corpus on both his second and third subclaims of his First Ground for relief.

## IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Ramjit raises seven different bases for Ground Two of his petition, the ground encompassing his claim for ineffective assistance of trial counsel.  The Magistrate Judge directly addressed the first and the third subparts.  As to the first subpart – "opening the door" to the admission of Johnson's out-of-court confession – the Magistrate Judge found that, <u>if</u> the Confrontation Clause had not been violated by the introduction of Johnson's out-of-court confession, then counsel's "opening the door" to those out-of-court statements constituted ineffective assistance.  As to the third subpart – failure to move for a mistrial after an alternate juror was substituted for an already deliberating juror – the Magistrate Judge found that this error also warranted habeas relief.  Having so found, the Magistrate Judge did not address the remaining five subparts.

In order to demonstrate that Ramjit was denied the right to effective assistance of counsel,

---

[14]  Because the Court distinguishes this case from *Richardson* on other grounds and finds it governed by *Douglas* and *Bruton*, the Court does not address whether the issue of the absent jury instruction was properly preserved by defendant's counsel or whether it even needed to be – i.e., whether the absence of such an instruction (deemed critical in *Richardson*) would constitute plain error.

he must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the [process] cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1985).  A claim of ineffective assistance of counsel has two components: (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Id.* at 687.  The first component is viewed under an "objective standard of reasonableness" as judged by "prevailing professional norms." *Id.* at 687-88.  In order to constitute deficient performance, a petitioner bears the heavy burden of showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment.  *Id.* at 687-688.   The second component requires a showing that counsel's errors so upset the adversarial balance that the proceeding "was rendered unfair and the verdict rendered suspect." *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).

In the first subpart, Ramjit argues that he was denied his Sixth and Fourteenth Amendment right to the effective assistance of counsel at trial due to his attorneys' "failure to object and/or move to strike non-responsive hearsay answers volunteered by the prosecution's homicide investigator regarding what co-defendant Bobby Johnson told him about the murder, and then asking an alleged 'door-opening' question which gave the prosecutor a pretext for introducing Johnson's entire, unsworn, out of court statement."  The Magistrate Judge found that this subpart warranted habeas relief, "assuming *arguendo* that the introduction of Johnson's statements did not violate the Confrontation Clause."  The Court reads that finding to be an alternative finding, and, because the Court concludes that Ramjit's right of confrontation was violated in this case, it does not address this

35

subpart.[15]

In the third subpart, Ramjit argues that he was denied his right to effective assistance of trial counsel because of his attorney's "failure to move for a mistrial after the court dismissed one of the regular jurors for cause during deliberations, and after all alternatives had been excused."  The Magistrate Judge found that Ramjit was entitled to habeas relief on this claim because the result of an objection to the juror substitution "would have been the declaration of a mistrial and a chance to re-try the case free of the errors which allowed the admission of Johnson's out-of-court statements against Ramjit."  The Magistrate Judge cited *Ohio v. Locklear*, 61 Ohio App.2d 231 (1978), for the proposition that, when an alternate juror is substituted for a regular juror after deliberations have begun, "the only course available to the court is to declare a mistrial and retry the case."  (R&R at 55.)  The Magistrate Judge found that such a failure was an "inexplicable lapse" that "cannot be dismissed as a 'strategic choice.'"

Respondent objected to the Magistrate Judge's finding, arguing that (1) the decision by defense counsel not to object to the juror substitution was a "strategic choice," and (2) replacement of a juror after the start of deliberations is not *per se* plain error; there must be a showing of actual prejudice that resulted from the substitution.  First, the Court is not persuaded by Respondent's first argument that defense counsel made a conscious, strategic decision not to object to the juror substitution.  Respondent argues that the defense's case rested on the element of surprise, an advantage that would have been lost if the case were retried.  As already noted above, *see infra*

---

[15]  The Court notes, however, that there is some difficulty in determining that trial counsel was constitutionally deficient on this basis when the Court has already found that the "opening the door" ruling by the trial court is not supported by either evidentiary rules or constitutional law.  *See infra,* fn. 9.  As such, charging trial counsel with a deficient performance for committing such "errors" seems inconsistent.

section III.A, Respondent's theory that defense counsel's mistakes were part of an elaborate, surprise defense strategy is simply not supported by the record, no matter how Respondent tries to mischaracterize the transcript.[16]  As to the second argument, Respondent's objections have merit; the Court agrees that a showing of actual prejudice is a predicate to relief on this ground and that the Magistrate Judge should have addressed that issue.  Because the Court finds, however, that the juror substitution did result in actual prejudice in this case, the Court ultimately agrees with the Magistrate Judge that Ramjit was denied effective assistance of counsel by trial counsel's failure to object to the trial court's handling of the deliberating jury.

At the time of Ramjit's trial, Rule 24(F) of the Ohio Rules of Criminal Procedure provided that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties . . . an alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."[17] (emphasis added).  Because the only rule addressing juror substitution provided that substitution must be made prior to deliberations, an Ohio appellate court had found, well prior to Ramjit's trial, that a substitution that occurred after deliberations had begun, in the face of an objection by defense counsel, required a mistrial.  *See Locklear*, 61 Ohio App.2d

---

[16]  For example, defense counsel moved for a mistrial on three different occasions: when evidence was introduced that Ramjit used marijuana, when evidence was introduced that Ramjit owned a bullet-proof vest, and when the trial court allowed Johnson's out-of-court statements to come in to the trial.  Clearly, Respondent's argument that an the element of surprise was part of the defense strategy, and that it was a strategic choice not to seek a retrial, is not consistent with actions of defense counsel during the rest of the trial.

[17]  Rule 24(F) was amended on July 1, 2002 to change the procedure for holding alternate jurors in capital cases.  The text of Rule 24(F), quoted above, is currently contained in Rule 24(G)(1).

at 233-234.  The Magistrate Judge relied on that case alone to find that Ramjit's trial counsel was deficient in failing to object to the juror substitution in this case.  As Respondent correctly points out, however, the rule found in *Locklear* is not a unanimous rule, and perhaps not even the majority rule, in Ohio.  *See Ohio v. Milley*, 77 Ohio App.3d 786, 790 (1991) ("Other Ohio and federal courts, however, have shunned the *per se* rule by requiring reversal only where there is some showing of prejudice. . . We consider this to be the better rule.").  Many, if not most, Ohio courts require a showing of actual prejudice in order to warrant a mistrial.  *Id.*

Even under the "actual prejudice" standard, the circumstances of this case compel a finding that Ramjit's counsel was constitutionally deficient in failing to move for a mistrial after the juror substitution.  Significantly, the trial court did not instruct the jury that it was to begin deliberations anew when the alternate replaced the regular juror.  "The premise for requiring the trial court to instruct the jury to begin deliberations anew is grounded in the belief that the fundamental right of a fair and impartial deliberation is to be protected. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member." *Milley*, 77 Ohio App.3d at 791.  Failure to give such an instruction, depending on the record, can result in a "manifest miscarriage of justice."  *Id*.  A juror substitution procedure must "preserve[] the 'essential feature' of the jury." *Id.* (citation omitted).  As defined by the United States Supreme Court, the "essential feature" of the jury is "the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams v. Florida*, 399 U.S. 78, 101 (1970).

In the present case, the Court finds that the failure to instruct the jury to begin deliberations

38

anew removed the jury's "essential feature" and arguably resulted in a miscarriage of justice. Especially egregious is the fact that the alternate juror appears not to have been present for the bulk of the deliberations, however brief they may have been.  The alternate juror joined the jury late in the afternoon on Friday, October 29, 1999, the same day on which the jury returned the verdict. Although the jury had been deliberating only since the day before, the time between the alternate joining the deliberations and the rendering of the verdict is minimal at best.  At worst, the jurors had already reached their conclusion by the time the alternate joined the deliberations.  "[W]here the deliberative process has progressed for such a length of time or to such a degree that it is strongly inferable that the jury has made actual fact-findings or reached determinations of guilt or innocence, the new juror is likely to be confronted with closed or closing minds. In such a situation, it is unlikely that the new juror will have a fair opportunity to express his or her views and to persuade others."  *Id.* at 792-93 (quoting *New Jersey v. Corsaro*, 107 N.J. 339, 352 (1987)).

Given that the juror substitution in this was clear error, failure of defense counsel to object to the juror substitution, or to move for a mistrial, constitutes a deficient performance of counsel. As the Magistrate Judge concluded, moreover, the failure to object to this obvious violation of law deprived Ramjit of the opportunity to enforce the serious constitutional errors that plagued his trial. Consequently, Ramjit's trial counsel's performance not only was constitutionally deficient, but actually prejudiced Ramjit, thereby justifying the relief he seeks.

## V.    CONCLUSION

For the reasons outlined above, the Court **ADOPTS in part** the Magistrate Judge's R&R and hereby **GRANTS** Ramjit's petition for a writ of habeas corpus.  The Court grants habeas relief on

the bases of Ramjit's second and third subclaims of his First Ground for relief, and the third subpart of Ramjit's Second Ground for relief.[18]

Accordingly, the Court **ISSUES** a writ of habeas corpus as follows.  The Respondent shall either: (1) set aside Ramjit's conviction, or (2) conduct another trial.  This shall be done within 180 days from the effective date of this Order.  On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

In addition, the Court hereby **ISSUES** a Certificate of Appealability as to all grounds asserted in the petition.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: March 31, 2006**

---

[18]  The Court does not address the Magistrate Judge's finding that two of Ramjit's four Confrontation Clause subclaims were procedurally defaulted or Ramjit's additional claims, not considered by the Magistrate Judge, for ineffective assistance of trial and appellate counsel and actual innocence.